(REV.5/85) Criminal Complaint

AUSAs Ronald DeWald (312) 886-4187
Lindsay C. Jenkins (312) 353-0962
Kenneth Yeadon (312) 353-5326

UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

UNITED STATES OF AMERICA

v.

JUAN JOHNSON,
HAROLD MARTINEZ

## MAGISTRATE JUDGE COX

CRIMINAL COMPLAINT

CASE NUMBER:

**08 CR 828**

UNDER SEAL

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief: On or about ___August 10, 2007___ in ___Cook___ County, in the __Northern__ District of __ Illinois_ defendants did,

knowingly and intentionally distribute, and aid and abet the distribution of a controlled substance, namely, mixtures containing in excess of 50 grams of cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance;

all in violation of Title _21_ United States Code, Section __841(a)(1)_ and Title _18_, United States Code, Section _2_.

I further state that I am a _Special Agent with the Federal Bureau of Investigation_ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT.

Continued on the attached sheet and made a part hereof: _X_ Yes _____ No

**FILED**

OCT 1 4 2008 TC

October 14, 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

_Jennifer Gregory Hall, Special Agent_
_Federal Bureau of Investigation_
Complainant

Sworn to before me and subscribed in my presence,

October 14, 2008
            Date

at ___Chicago, Illinois___
        City and State

2:40p

Susan E. Cox, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS    )
                          )   SS

COUNTY OF COOK    )

## AFFIDAVIT

I, Jennifer Gregory Hall, being duly sworn under oath, state as follows:

1.    I have been employed by the Federal Bureau of Investigation ("FBI") as a Special Agent for approximately 10.5 years. As a Special Agent at the FBI, my primary duties consist of investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846. I have received special training in the enforcement of laws concerning controlled substances and gang activity. I have also been involved in various types of electronic surveillance, in the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution of controlled substances.

2.    The following information is based upon: my personal observations and knowledge; my participation in this investigation; information that I have received from other federal law enforcement officers; information that I have received from officers with the Chicago Police Department ("CPD"); analysts from the High Intensity Drug Trafficking Area ("HIDTA"); my experience and training and the training and experience of other law enforcement officers; information provided to law enforcement officers by a cooperating

witness ("CW"); and consensually recorded conversations.[1]

3.      As this Affidavit is for the limited purpose of establishing probable cause to support the foregoing criminal complaint, it contains only a summary of relevant facts. I have not included each and every fact known to me concerning the individuals and events described in this Affidavit.

## Background

4.      CW[2] has been working with the FBI since approximately the summer of 2007. While CW is not a member of the Spanish Cobras, CW is a member of a street gang that is an ally of the gang and, as a result, CW has had interaction with high level members of the Spanish Cobras. CW stated that for many years, he/she knew JUAN JOHNSON as "Big Juan," the leader of the Spanish Cobras street gang, and that he/she believed that he/she could purchase crack cocaine from JOHNSON.

5.      On or about August 3, 2007, CW and JOHNSON arranged to meet at JOHNSON's house in Chicago. CW agreed to wear an audio recording device and ask

---

[1] The recorded conversations described throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my or other agents' understanding of what is being said during the recordings, based on their content and context, and based on my and other law enforcement officers' experience. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations, and are not intended to be a final transcript of the audio recordings from which the quotes are taken.

[2] CW has been arrested for offenses including first degree murder, domestic battery, and possession of a stolen vehicle and has convictions for first degree murder as a juvenile and domestic battery. CW was arrested on the possession of a stolen vehicle charge while on parole, and is cooperating with law enforcement in the hopes of receiving a reduced sentence on his parole violation charge as well as substantive crime. The substantive crime was eventually dismissed by the state, but not at the request of FBI. CW is aware that the charge has been dismissed, but has continued cooperating with law enforcement. FBI paid CW's expenses that were incurred as a result of this investigation.

JOHNSON to purchase crack cocaine for him. CW drove to JOHNSON's residence and then walked to the rear door. CW went inside, but, a few minutes later, returned back outside with JOHNSON. FBI agents and CPD officers conducted surveillance and identified JUAN JOHNSON as the person with CW. CW and JOHNSON then engaged in a long conversation that was recorded by the recording device concealed on CW. During the conversation, CW told JOHNSON that he/she had some people who wanted to purchase "rock" [crack cocaine], but that CW's usual supplier had moved away from town. CW added that he/she remembered that JOHNSON had offered to "point [CW] in the right direction." JOHNSON asked how much CW wanted to purchase, and CW responded, "I don't know, maybe four and a split at the most, maybe two and a half ounces." JOHNSON responded, "Aren't you and Haro [HAROLD MARTINEZ] cool?" CW replied that they were cool, but that CW did not have MARTINEZ's number. JOHNSON told CW that he would put MARTINEZ and CW together when CW was ready to purchase the crack cocaine. CW then asked whether MARTINEZ would have the cocaine "already rocked up." JOHNSON replied that MARTINEZ had been "calming down" because MARTINEZ was worried about being caught by the police. JOHNSON agreed to call MARTINEZ on the following week, and then declined to take a "finder's fee" from CW because they would help each other out.

6. At the end of the conversation, CW reminded JOHNSON that he/she wanted to "make that move next week," the crack cocaine purchase from MARTINEZ. JOHNSON responded that CW should "e-mail me ... I don't do that computer phone shit [text message],

but you could e-mail me ... or send me a message though My Space ... I barely log on, but you want to send messages to each other, it's better on a computer ... it's a lot easier to do it on computer, and even if you text message, people don't know how easy it is to get the texts ... you don't even need a search warrant to get your texts."

7.     On or about August 9, 2007, CW placed a recorded and consensually monitored phone call to JOHNSON. During the conversation, CW told JOHNSON that he/she would be "touching down tomorrow," meaning that CW would have the money and wanted to know if they could "do that [the crack cocaine transaction]." JOHNSON responded that he would try to set something up because JOHNSON was having a meeting with "him" in an hour and a half. CW asked JOHNSON to "figure out some numbers for [CW]" and then call CW back with the price of the crack cocaine.

8.     On or about August 10, 2007, CW and JOHNSON engaged in another consensually monitored and recorded phone call. In that call, CW asked JOHNSON about the drug transaction. JOHNSON instructed CW to "just show up and stop all this extra shit." CW told JOHNSON that he/she just wanted to "make sure everything is in motion."

9.     On or about August 10, 2007, at approximately 3:20 p.m., CW and JOHNSON engaged in another consensually monitored and recorded phone call. During the conversation, CW told JOHNSON that he/she just got out of traffic and wanted to know where to meet JOHNSON for the drug transaction. JOHNSON told CW that he needed to first "call him and see where he [was]." JOHNSON then instructed CW to meet him and

4

JOHNSON's house, where JOHNSON would pick up CW and that they would together call "HARO," which CW knew was the nickname of HAROLD MARTINEZ.

10.     Prior to meeting with JOHNSON, agents searched CW1 and CW1's vehicle for drugs or other contraband, finding none. Agents then gave $1,500 to CW to buy the crack cocaine from JOHNSON and activated an audio and video recording device which they concealed on CW.

11.     CW met JOHNSON at JOHNSON's house and CW got into JOHNSON's car. FBI agents and CPD officers followed JOHNSON and CW as JOHNSON drove off. After making a stop at a restaurant for food, JOHNSON drove CW to a barber shop located at 2552 W. Division Avenue in Chicago, where they parked and waited for MARTINEZ to arrive. While they were waiting, JOHNSON asked CW how much crack cocaine that CW wanted to buy. CW responded, "two and a half (ounces)," and asked JOHNSON whether he thought MARTINEZ would give CW a good price. JOHNSON explained that MARTINEZ "always has" provided a good price for crack cocaine. JOHNSON then asked CW whether he/she wanted to buy it "raw (powder cocaine)." CW responded that he/she wanted "rock" (crack cocaine). JOHNSON suggested to CW that he should "get it raw" and cook the powder cocaine into crack cocaine himself/herself. CW explained that he/she did not have a place to cook the cocaine. JOHNSON then asked CW where he/she would be "serving (selling the crack cocaine)." CW responded that he/she was not "selling no [expletive deleted] dimes (small bags of crack cocaine worth $10.00)." The conversation was recorded by the

5

recording device concealed on CW.

12.    A few minutes later, JOHNSON received a telephone call. When JOHNSON answered it, he told CW that the call was from "HARO." After determining that JOHNSON and CW were waiting for HARO outside of the wrong barbershop, JOHNSON told CW that MARTINEZ would come over to them.

13.    FBI agents and CPD officers, who were keeping a continuous surveillance on JOHNSON and CW, saw MARTINEZ drive up and park across the street from JOHNSON and CW. MARTINEZ and a child, who for the purpose of this affidavit will be referred to as Minor A, got out of MARTINEZ's vehicle and walked over to JOHNSON and CW. While JOHNSON, CW, and MARTINEZ discussed other issues, CW watched as JOHNSON typed a message for MARTINEZ into his cellular telephone asking MARTINEZ for the price of two and a half ounces of cocaine. JOHNSON then told MARTINEZ that he did not like to "speak out loud" and pointed to the speakers in his vehicle, which CW understood to mean that JOHNSON believed he was being listened to by law enforcement. MARTINEZ said that the price would depend if CW wanted it "cooked." JOHNSON told MARTINEZ that CW did want it cooked. MARTINEZ said that it would be "15," which CW understood meant $1500. When CW told them that he/she had the money, MARTINEZ said he had to go "cook it." JOHNSON told CW and MARTINEZ to "exchange numbers" so that JOHNSON did not have to "do this no more."

14.    CW then asked how long it would take MARTINEZ to cook the crack cocaine,

6

and MARTINEZ responded that he would be ready to complete the transaction in about an hour to an hour-and-a-half. MARTINEZ said that he would have to "grab it," go somewhere, and then "whip it up" which he estimated would take approximately "15 to 20 minutes to cook it." CW told MARTINEZ that he/she would call MARTINEZ later to complete the transaction. MARTINEZ and Minor A left JOHNSON's car, and then JOHNSON and CW drove away.

15.     After making another stop on the way back to JOHNSON's residence, CW left JOHNSON's residence and met with FBI Agents. The recording device, which continuously recorded all of the events since it was first concealed on CW, was deactivated and removed from CW's person.

16.     At approximately 5:27 p.m., CW placed a consensually monitored and recorded phone call to the number that MARTINEZ had given CW earlier in the day. MARTINEZ answered the phone, and CW recognized MARTINEZ's voice from their conversation earlier in the day. MARTINEZ told CW that he was preparing for the drug transaction and that he would be ready in approximately 30 minutes.

17.     Approximately a half hour later, CW placed another consensually monitored and recorded phone call to MARTINEZ. CW told MARTINEZ that he/she was not trying to bother MARTINEZ, but still wanted to know when they could conduct the transaction. MARTINEZ said he was "right here, doing this right now" and that he would be done in less than 20 minutes. MARTINEZ then suggested that they meet near Keeler and Wrightwood

7

Avenues to make the transaction.

18.     At approximately 6:12 p.m., the recording devices were reactivated and concealed on CW. CW returned to his/her vehicle and drove to the northwest corner of the intersection of Keeler and Altgeld Avenues in Chicago. FBI agents and CPD officers followed CW and kept CW under constant surveillance. Shortly thereafter, the surveillance officers saw MARTINEZ park on the southwest corner of the intersection of Keeler and Altgeld Avenues. As surveillance agents watched, MARTINEZ approached the driver's side window of CW's vehicle and withdrew a clear plastic bag containing a off-white rocky substance from his right front pocket. MARTINEZ dropped the bag of suspect crack cocaine into CW's lap while simultaneously taking the $1500 that CW handed to him. MARTINEZ told CW that it was only two and a quarter ounces, but CW said that it was enough. CW then drove away.

19.     CW met with FBI agents and gave them the bag containing suspect crack cocaine to them. The agents then search CW and CW's for any other money or contraband and found only the money that CW originally had in his/her possession.

20.     The bag containing the suspect crack cocaine was sent to the Drug Enforcement Administration ("DEA") laboratory, where it was tested by an expert in the area of forensic chemistry and found to contain 62.3 grams of a mixture containing cocaine base and sodium bicarbonate. Based on my training and experience, the appearance of the substance, and my knowledge of the facts of this case, I believe the substance is cocaine base

8

in the form of crack cocaine.

21.    Based upon the information set forth above, there is probable cause to believe

JOHNSON and MARTINEZ distributed, and aided and abetted the distribution of more than

fifty grams of cocaine base in the form of crack cocaine, in violation of Title 21, United

States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

FURTHER AFFIANT SAYETH NOT.

JENNIFER GREGORY HALL
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 14th day of October, 2008.

2:40 pm

SUSAN E. COX
United States Magistrate Judge

9